| | |
|---|---|
| Pauline Palmer–Williams,<br>    *Plaintiff*,<br><br>    *v.*<br><br>Yale New Haven Hospital,<br>    *Defendant.* | Civil No. 3:08cv1526 (JBA)<br><br><br><br>March 25, 2011 |

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Pauline Palmer–Williams filed suit against Defendant Yale–New Haven Hospital ("YNHH") for race and national–origin discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Connecticut Fair Employment Practices Act (CFEPA"), Conn. Gen. Stat. § 46a-58, *et seq*, and she further claims intentional infliction of emotional distress. Defendant moves for summary judgment on all claims, and for the following reasons, Defendant's motion will be granted.

I.    Factual Background

Plaintiff is a black female, originally from Jamaica. She began work at YNHH on October 31, 1988. In 2002, she was interviewed and hired by Program Manager Judith Yoia for a newly–created position, Clinical Documentation Consultant ("CDC") in the Clinical Documentation Management Program, established to improve Medicare billing. (Perrotti Aff. [Doc. # 70] ¶ 6.) During her tenure at YNHH, Plaintiff was the only black CDC. As supervisor of the CDCs, Yoia conducted Plaintiff's annual performance evaluations. (*Id.* ¶ 6.) While reporting to Yoia, Plaintiff became the most highly compensated CDC, receiving the maximum salary increase for which she was eligible each year. (*Id.* ¶ 7.)

As a CDC, Plaintiff reviewed medical records of Medicare patients to ensure that services received from YNHH were properly coded so that YNHH received appropriate reimbursement. (Yoia Aff. [Doc. # 71] ¶ 4.) It is standard protocol for a CDC who believes that services were not appropriately coded to initiate a query to the responsible health–care provider, recorded on a "pink sheet." (*Id.* ¶ 7.) Yoia reviewed pink sheets to determine if queries were successful, subjectively assigning a relative–weight value ("RW" rating) to the query. A query that results in the capturing of additional revenues as a result of coding previously overlooked services could result in an R1, the highest RW–code enhancement, while an unsuccessful query is coded as an R9. (*Id.* ¶ 8.) Each CDC had an annual RW–code enhancement goal, which was one of eleven factors Yoia used in evaluating CDCs' annual performance. If a CDC met the budgeted RW–enhancement goal for the year, based on adding RW scores for each month, she was awarded a 2–rating for "meet[ing] expectations," and if she exceeded the goal, she was awarded either a 3–rating for "accomplished" or a 4–rating for "distinguished." (*Id.* ¶ 17.)

A.    Yoia's feedback

Although Yoia avers that Plaintiff "was highly skilled and quite good at her job," she also says that Plaintiff "had some interpersonal conflicts that I had to address with her as her supervisor." (Yoia Aff. ¶ 11.) For instance, in May 2004, Plaintiff "inappropriate[ly]" confronted a coworker in the Coding Department. (*Id.*) After consulting with Lina Perrotti, Manager of the YNHH Employee Relations Department, Yoia drafted a Performance Management Memorandum in late May 2004 with a copy to her supervisors Richard Lisitano and Perrotti for their feedback. (*Id.*)

Due to difficult group dynamics, Yoia held a team–building meeting for CDCs on June 2, 2004. (*Id.* ¶ 12.) Plaintiff testified that during this meeting, her coworker Maryann Baer–Hines reported that another coworker Brenda Reig told her that "Ju[dy Yoia] said she didn't like to work with black people." (Palmer–Williams Dep., Ex. 1 to Pl.'s Obj. [Doc. # 80] at 36:22–37:5.) According to Plaintiff, Yoia responded to Baer–Hines's comment by stating at the meeting that "Brenda's idea of keeping a secret is to tell everyone." (*Id.* at 37:12–20.) Yoia avers that it was Plaintiff who had stated that "Ms. Reig told her that I said I did not like working with black people," to which Yoia responded "'Don't go there' and said I did not say any such thing and that the comment did not make any sense because I am the person who hired plaintiff." (Yoia Aff. ¶ 13.) When Plaintiff told her "I learned that you said that you didn't like black people," Yoia laughed. (Palmer–Williams Dep. at 188:20–22.) Plaintiff also claims that at some point, Yoia told her "I have a problem with your accent." (*Id.*) According to Yoia, "[o]n rare occasions, including one time plaintiff left me a voicemail message, I had difficulty understanding plaintiff when she spoke quickly. On those occasions, I explained that I did not understand, and asked her to slow down and repeat what she said." (Yoia Aff. ¶ 26.)

On June 3, 2004, Yoia met with Plaintiff and gave her the performance evaluation she had earlier prepared about Plaintiff's interpersonal conflicts. Plaintiff characterized this meeting as Yoia "wr[iting] [her] up and threaten[ing her] with termination." (*Id.* at 38:12–18.) According to Yoia, during this meeting, "Plaintiff again raised the issue of the comment she claimed Ms. Reig told her I made," and Yoia "repeated that the comment made no sense because I hired Plaintiff." (*Id.* ¶ 14.) The evaluation Yoia gave Plaintiff served as documentation of "a verbal altercation with another employee" in 2002; "rude behavior"

with "an external consulting firm"; "issues surrounding communication, teamwork and cooperation and the way you are perceived by others when under stress"; and "a verbal altercation between [Plaintiff] and a member of the coding department, initiated by [Plaintiff], despite [Yoia] advising [Plaintiff] not to confront this employee." (Ex. C to Mem. Supp. at 2.)

On June 10, 2004, after discussions with Lisitano and Perrotti, Plaintiff filed a formal grievance. (*Id.*) Although Plaintiff says she told them what she had heard about Yoia not liking to work with black people (Palmer–Williams Dep. at 206:2–9; 208:21–209:5), her actual grievance was silent on the point. (*See* Grievance, Ex. C.) Plaintiff attached Yoia's evaluation given at the June 3 meeting to the grievance and wrote

> I am filing a grievance in response to erroneous information cited in a memorandum given to me by my supervisor, Judy Yoia. . . . I think it is an unfortunate but gross misrepresentation of the facts and in part an impulsive reaction to disclosures at our team building meeting Jun 2, 2004. It is my impression the memorandum in question is in fact the initial step in the disciplinary process. Therefore, the basis of my grievance is unfair discipline. I would like this information to be removed from all files.

*Id.*

In response to Plaintiff's grievance and a follow–up meeting with Plaintiff on June 15, 2004, Lisitano wrote that because the disciplinary nature of Yoia's memorandum was "unclear," he would ask Yoia to "reissue the document with some minor revisions that will remove any disciplinary tone," because the memorandum is "documentation of feedback from your manager to you" and "is not a disciplinary action." (*Id.*) Sue Fitzsimmons, Senior Vice President of patient services at YNHH, wrote Plaintiff a letter on August 18, 2004, further explaining that Yoia's performance memorandum "represent[ed] your supervisor's observation regarding behaviors and an effort to raise your awareness with

respect to the manner you are perceived by others," and as a "counseling memo, this is absolutely appropriate." However, Fitzsimons reiterated that Yoia's memorandum was not a disciplinary action, and to that extent, she wrote that "I assure you, the memo will *not* be placed in your Human Resources personnel file and will not be considered a disciplinary step." (*Id.* (emphasis in original).)

On a separate occasion, the date of which is unclear from the record, Plaintiff and a white coworker, Jackie Russell went shopping in downtown New Haven after work where they were seen by one of Yoia's supervisors, who notified Yoia. (Palmer–Williams Dep. at 383:12–24.) The following week, Yoia called Plaintiff into her office to ask her whether she had gone shopping during the workday, and Plaintiff produced a receipt showing that she made her purchase at 5:30 p.m., after her workday had ended. (*Id.* at 384:1–3.) Yoia never made similar inquiries of Russell. (*Id.* at 385:13–14.) Plaintiff was never reprimanded beyond Yoia asking her whether she had gone shopping during the workday. (*Id.* at 387:5–24.)

### B.     Reporting Discrepancies

Plaintiff says that while at YNHH, she was occasionally not given full credit for her pink sheets. Before 2006, there were "one or two" such discrepancies, and in those instances, Plaintiff "approached [Yoia] and there would be a manual adjustment." (Palmer–Williams Dep. 109:18–20.) According to Plaintiff, she first believed that Yoia miscalculated her monthly individual "R" score in 2003, and when Plaintiff brought it to Yoia's attention for fiscal years 2003 and 2004, Yoia addressed those concerns. (*Id.* at 103:14–19.) Plaintiff also noticed at times what she believed to be her coworkers getting more credit from Yoia for their pink sheets than they were due, which she reported to Yoia. (*Id.* at 110:7–9.) Plaintiff

based her observation on pink sheets meant to be shredded that she found on a confidential bin. (*Id.* at 117:18–118:20.) Plaintiff's deposition testimony further varyingly stated that she would take pink sheets to Yoia between 2006 and 2008. (*Id.* at 123:7–19; 130:14–133:15.) Plaintiff referred in her deposition to a "report," not in evidence, that shows that a white CDC had 22 R1s but got credit for 26, a discrepancy she brought to Yoia's attention. (*Id.* at 108:7–9.) However, Plaintiff never saw a coworker's performance evaluation, other than a quarterly report for Melanie Davis, whose "scores were way, way down," and Plaintiff provided no other basis for knowing how her coworkers were ultimately evaluated. (*Id.* at 381:24–383:1).

For 2006, based on all of her pink sheets, Plaintiff believed she was entitled to an RW enhancement score of over 170 points, which would have qualified her for a "3 rating" on her 2006 performance evaluation, which accounted for 25 percent of her overall outcome–based goals assessment score. (Palmer–Williams Dep. at 298:11–14.) However, based on Yoia's calculations, Plaintiff's RW enhancement score was 136.50, and Plaintiff received only a "2 rating." (2006 Eval., Ex. G to Def.'s Mem Supp.) Yoia wrote in the comments section of Plaintiff's 2006 evaluation that "[a] number of factors, including a two–week medical leave may have contributed to Pauline's inability to meet the minimum goals established at the beginning of the fiscal year. I do not want to discount the fact that her interventions resulted in a $1.1 million contribution to the bottom line." (*Id.*) Plaintiff's composite final score was 6.75 out of 8, which was "Highly Competitive" and gave her a 4 percent raise based on all eleven criteria. (*Id.*)

Plaintiff responded to her review by claiming that her RW–enhancement score was incorrect and did not reflect all of her successful queries; she provided Yoia with pink sheets

she said were under–reported. Yoia avers that she "reviewed one month's worth of pink sheets plaintiff provided . . to compare the information from the pink sheets to that in the year end report" and "did not find any inaccuracies in the data" she reviewed. (Yoia Aff. ¶ 18.) Yoia "prepared a spreadsheet with the pink sheets [she] reviewed," which she gave "to the plaintiff and told her that she could review the information for the rest of the year and, if [Plaintiff] found [the] computer generated report was incorrect, [Yoia] would retroactively correct her evaluation." (*Id.*) Yoia further avers that "Plaintiff did not provide me with any data suggesting that the computer report for 2006 was incorrect, and so her 2006 evaluation remained unchanged." (*Id.*) However, Plaintiff maintains that despite Yoia's corrections, Plaintiff's performance evaluation for 2006 still failed to credit all of the work she had done, and continued to do so in fiscal years 2007 and 2008 even though she repeatedly brought such discrepancies to Yoia's attention.

D.    Termination

On May 12, 2009, as part of the discovery process in this case, Plaintiff produced 200 pink sheets completed by other CDCs, which contain identifying information about YNHH patients. (Perrotti Aff. ¶ 13.) According to Plaintiff, the sheets were copies she made at work and personally redacted, the only time she took them from the Hospital was at Defense counsel's request, and she gave them to him through her lawyer. (Palmer–Williams Dep. at 405:9–23; 119:1–7 ("I took them from the hospital—the only time when Attorney Cohen asked for them and I brought them. They were requested through my lawyer and I took them then and brought them to my lawyer to give to Attorney Cohen to validate my claim.").) Defendant's Requests for Production, dated February 25, 2009, requested that Plaintiff provide "[a]ll documents pertaining to your claim that numbers attributed to white,

non Jamaican clinical documentation consultants were embellished." (Ex. 1 to Def.'s Reply.)

CDCs are not authorized to remove pink sheets from the hospital, because they contain patients' "protected health information" ("PHI"). YNHH's Administrative Policies and Procedures set forth the process whereby an employee may obtain authorization to disclose PHI or other confidential information. (*See* Ex. R.) It provides that

> [i]t is the policy of the YNHHS facilities to release information only upon either the written authorization of the patient or his/her Personal Representative . . . or upon other appropriate authority, including subpoena, search warrant, or court order. . . . For questions related to disclosures not mentioned here, contact legal counsel, the Risk Management Department, or the Privacy Officer, as appropriate.

(*Id.* at 2.) The Procedures also provide that subpoenas will be honored "only when they comply with both the terms of HIPAA . . . and relevant state law," meaning that they are "accompanied by an order issued by a court or administrative tribunal provided that the YNHHS facility discloses only the information specified" or are "accompanied by a statement, from the party seeking the information, providing that . . . [t]he party seeking the information has made reasonable efforts to ensure that the individual who is the subject of the PHI has been given notice of the request" or "[t]he party who is the subject of the valid subpoena or his or her legal representative has made reasonable efforts to secure a qualified protective order." (*Id.* at 7.) YNHH's Confidentiality Policy also provides that unauthorized distribution of PHI will result in "discipline up to and including termination." (Ex. S at 2.) There is no evidence that prior to removing the pink sheets containing PHI from YNHH, Plaintiff sought authorization or a qualified protective order, spoke with legal counsel about whether she was permitted to remove the pink sheets from hospital premises, or contacted the Risk Management Department or Privacy Officer.

8

Upon learning that Plaintiff had taken pink sheets created by other CDCs when those records were delivered to Defense counsel, YNHH initiated an investigation and determined that Plaintiff had not been required to access this information in connection with the performance of her duties and had not been authorized to access or remove the pink sheets. (*Id.*) YNHH concluded that Plaintiff violated its policies on compliance with the Health Insurance Portability and Accountability Act ("HIPAA"), Confidentiality, Patient's Rights, and Employee Conduct and Discipline and may have violated HIPAA as well. (*Id.*) During the course of Plaintiff's employment, she "completed training at the Hospital on HIPAA, patient's privacy rights, and the confidentiality of the Hospital's records," and was informed that it was against Hospital policy to "access[], cop[y], and remove[] from the Hospital" patients' records containing confidential information without authorization. (*Id.* ¶ 15.)

Following this investigation, on June 18, 2009, Lisitano wrote Plaintiff a letter informing her that her employment at YNHH would be terminated, effective June 19, 2009, "[g]iven the scope of the confidentiality breach and the reckless manner with which [Plaintiff] handled patient records." (Ex. N to Burns Aff. [Doc. # 72].) Lisitano's letter continued "[i]n our meeting on June 4, 2009, you were unable to provide any reasonable or accurate explanation for having these documents in your possession. Your claim that your manager gave the documents to you cannot be corroborated." (*Id.*) Plaintiff grieved the termination decision, and Fitzsimmons responded to her grievance following another meeting with her and taking into consideration what Plaintiff "felt was a history of [Yoia] finding fault with [Plaintiff's] work, and [Plaintiff's] assert[ion] that she treated [Plaintiff] differently from [her] co–workers":

The termination of your employment on June 19, 2009 involved the unauthorized removal of documents containing Protected Health Information of patients whose medical records were reviewed by you and your colleagues as a function of your role as Clinical Documentation Consultant. You assert that your manager gave you permission to make copies of the documents; however, at no time did Ms. Yoia permit you to copy documents containing PHI or the work of others for purposes other than the performance of your duties. Moreover, your removal of these documents from the Hospital and release to unauthorized individuals was clearly a violation of patient confidentiality under HIPAA.

You also told me that your copying and removal of these documents was in response to the Hospital's attorney's request for documents pertaining to your lawsuit. I have examined the correspondence between you and attorney Cohen (letter dated 6/7/08) stating 'I hope there will be consensus to permit me to provide these documents at the above stated meeting or another forum on condition there will be no retribution by my employer.' I have verified there was no 'consensus' or discussion whatsoever of regarding the content and nature of documents containing confidential information. In fact, you clearly knew these were confidential documents by your reference in this letter and your attempts to redact some of the identifying patient references.

(Ex. O to Burns Aff.)  Thus, Fitzsimmons affirmed the earlier termination decision.

Plaintiff further appealed. Richard D'Aquila, Executive Vice President and Chief Operating Officer of YNHH met with Plaintiff, conducted a review of the facts and the subject documents, and concluded that based on the "high level of patient confidentiality required in [Plaintiff's] duties as a Clinical Documentation Specialist and the emphasis on safeguarding patient records," he did not credit her assertion that Defendant's counsel's requests for production authorized Plaintiff to copy records containing PHI and remove them from Hospital property without authorization. (D'Aquila Letter, Ex. R to Burns Aff.) He noted that although Plaintiff earlier referred to confidential documents, she did not mention that these documents contained HIPAA–protected patient information, such that they implicated Defendant's HIPAA–compliance policy. (*Id.*) He also explained that

10

although Plaintiff copied worksheets in the past to discuss discrepancies with Yoia, "[c]learly, there is a distinction between the copying of documents for internal business related discussions and unauthorized use for personal reasons. This concept is covered specifically in the annual Healthstream training," which the records indicated Plaintiff having attended. (*Id.*)

## II. Discussion[1]

### A. Discrimination

Defendant argues that there is no evidence of an adverse employment action, and therefore, Plaintiff's discrimination claims under Title VII and the CFEPA must fail.[2] At the summary judgment stage in Title VII, applying the *McDonnell Douglas Corp. v. Green* burden shifting test, 411 U.S. 792, 802 (1973), "a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). Initially, a plaintiff must establish a *prima facie* case of discrimination under both statutes by making a *de minimis* showing that

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non–moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

[2] Because federal law guides analysis of Connecticut's anti-discrimination statutes, *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103 (1996), Plaintiffs' federal and state discrimination claims will be analyzed together.

> (1) [s]he is a member of a protected class; (2) [s]he is competent to perform the job or is performing [her] duties satisfactorily; (3) [s]he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.

*Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 803). On the fourth factor, it is sufficient that a rational finder of fact be able to draw any inferences of discrimination; "it is not the province of the summary judgment court to decide what inferences should be drawn." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (rational finder of fact could infer discrimination in termination of plaintiff's employment based on defendant's immediate effort to hire someone with the same qualifications and on plaintiff's prior satisfactory work performance).

It is undisputed that Plaintiff is a member of a protected class and is competent to perform her duties satisfactorily. However, the parties disagree as to whether there is any evidence of an adverse employment action. Defendant argues that the only adverse employment action is Plaintiff's termination, which only gives rise to Plaintiff's retaliation claim, while Plaintiff responds that she suffered other actions that were adverse, such as Yoia's failure to give her accurate credit for all of her pink sheets. For Title VII discrimination, a plaintiff "sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd of Ed.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal citations omitted). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a

particular situation." *Id.* (internal quotations omitted). On its own, a negative performance evaluation is not an adverse employment action; it must be accompanied by other adverse consequences to the terms and conditions of employment. *See Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 756 (2d Cir. 2004) (rejecting claim based on a negative performance evaluation where the plaintiff "offered no proof that th[e] evaluation had any effect on the terms and conditions of her employment").

Even if Yoia's failure to give Plaintiff proper credit for her pink sheets resulted in a less favorable performance evaluation than Plaintiff believed she was entitled to,[3] there is no evidence that Plaintiff suffered any actual effects beyond the evaluations themselves. Plaintiff received raises despite Yoia's failure to credit all of her work—the maximum possible salary increase every year that Plaintiff worked under Yoia's supervision according to Perrotti—and there is no evidence that those raises would or could have been larger had Plaintiff received higher RW enhancement scores.[4] Plaintiff also argues that these performance evaluations limited her career growth, based on her deposition testimony that "I think [the 2006 evaluation] would have affected my opportunity for advancement because when one is looking at the performance review, I don't think they're just going to look at one and the decision could be made based on the fact that my performance was below the minimum." (Palmer–Williams Dep. at 417:8–13.) However, Plaintiff never actually applied

---

[3] Plaintiff also argues that Yoia stated on Plaintiff's annual evaluations that Plaintiff performed below minimum expected standards (Opp'n at 22). None of the evaluations includes such a statement.

[4] In her opposition, Plaintiff argues that "[r]aises and salary obtained by the plaintiff are guided by the rating received on defendant's performance scale in her annual evaluations" (Opp'n at 9), yet there is no evidence to that effect, and the deposition testimony to which Plaintiff cites in support of that proposition says no such thing.

for any other jobs (*see id.* at 417:17), and her belief that hypothetical job reviewers may be put off by part of her performance evaluation is mere "conjecture or surmise," which is insufficient to defeat summary judgment. *See United States v. Forbes*, ---F. Supp.2d ----, 2010 WL 4038771, *4 (D. Conn. Sept. 30, 2010) (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)). Further, Yoia's reprimand of Plaintiff for being off–site on her own time and her statement that taking vacation may affect Plaintiff's job performance are not "materially adverse" changes in the terms and conditions of Plaintiff's employment. Because there is no evidence that Plaintiff suffered any ill–effects from what she says were worse performance evaluations, she has not suffered an adverse employment action and has failed to state a *prima facie* case of discrimination under Title VII, the CFEPA, and Section 1981.

B.     Hostile Work Environment

Plaintiff claims that she was subjected to a hostile work environment based on her race and national origin, citing that she heard that Yoia "doesn't like working with black people," that Yoia commented negatively on her accent, and "a myriad" of other issues related to Plaintiff's job performance and Yoia's critical feedback. "[T]o survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Aulicino v. New York City Dep't of Homeless Services*, 580 F.3d 73, 82 (2d Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals," *Alfano v. Costello*, 294 F.3d 365, 377 (2d

14

Cir. 2002), yet "facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact–finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]–neutral on their face were in fact discriminatory." *Id.* at 378.

Record evidence of overtly biased conduct—Plaintiff's coworker announcing that Yoia had said she "didn't like working with black people";[5] Yoia's dismissive response (laughing) when Plaintiff addressed that statement; and Yoia's negative comments about Plaintiff's accent—is limited, and a "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). The other evidence Plaintiff says demonstrates a hostile work environment—that Yoia was rude to her, subjected her to an unfair evaluation in 2004, and accused her of misconduct for shopping, while a white coworker accompanying her was not so–accused (although Plaintiff was never formally reprimanded)—is not so severe or pervasive as to alter the conditions of Plaintiff's employment. *See Lucenti v. Potter*, 432 F. Supp. 2d 347, 362–63 (S.D.N.Y. 2006) ("Allegations of even constant reprimands and work criticism are not sufficient to establish a hostile environment claim."). Therefore, Defendant's motion for summary judgment is granted to Plaintiff's hostile work environment claim.

---

[5] Yoia does not dispute that someone else announced in Plaintiff's presence at a staff meeting that Yoia had previously said she "didn't like working with black people"; rather, Yoia denied she ever made that statement in the first place.

C.     Retaliation

Defendant also argues that Plaintiff has failed to adduce sufficient evidence of retaliation under Title VII and the CFEPA.  Plaintiff argues that her termination was retaliation for her CHRO complaint and lawsuit and that Yoia's continued failure to credit all of her work was retaliation for Plaintiff's complaints to Lisitano and Perroti reports that Yoia said she does not like working with black people.  A *prima facie* retaliation claim requires evidence (1) that the plaintiff engaged in protected activity, (2) that the defendant was aware of the plaintiff's protected activity, (3) that the plaintiff suffered an adverse employment action, and (4) that there was a causal connection between the protected activity and adverse action.  *Kaytor v. Electric Boat Corp*, 609 F. 3d 537, 552 (2d Cir. 2010). If a plaintiff meets her minimal *prima facie* burden and the defendant sets forth its with legitimate non–discriminatory justifications for its actions, then the plaintiff must offer evidence sufficient for reasonable jurors to draw the inference that the proffered reasons are likely pretexts for retaliation. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1181 (2d Cir. 1996).  Defendant does not dispute the existence of the first three elements of Plaintiff's *prima facie* case as to Plaintiff's termination; Plaintiff's lawsuit and complaint to the Commission on Human Rights and Opportunities were protected activity, of which Defendant was aware, and Defendant terminated Plaintiff's employment.  Defendant disputes the existence of any evidence of causal connection between Plaintiff's complaint to the CHRO and filing of this law suit and her termination.

However, Defendant maintains that none of its employees' actions directed towards Plaintiff, short of her termination, were adverse.  The scope of Title VII's anti–retaliation provision is broader than its anti–discrimination provision, such that it applies to "employer

actions that would have been materially adverse to a reasonable employee or job application," meaning actions that "could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 61–67 (2006)), however, the Supreme Court in *White* emphasized that an action is only adverse for retaliation purposes if it is materially adverse, because "it is important to separate significant from trivial harms," and "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience" 548 U.S. at 68.

Plaintiff claims as adverse non–termination actions Yoia's failures to credit all of her work, resulting in worse performance evaluations than she believes she was entitled to; however, reprimands and negative performance evaluations are not, in and of themselves, materially adverse, to the point at which they would dissuade a reasonable employee from engaging in protected activity. *See, e.g.*, *Farina v. Branford Bd. of Educ.*, 3:09–CV–49(JCH), 2010 WL 3829160, * 16 (D. Conn. Sept. 23, 2010) (negative performance reviews alone, beginning five years before termination, were not materially adverse); *Alywahby v. Shinseki*, Nos. 01–CV–6512(NGG)(LB), 01–CV–8017(NGG)(LB), 04–CV–2183(NGG)(LB), 2009 WL 5166271, *6 (E.D.N.Y. Dec. 29, 2009) (a "satisfactory" rating, lower than the rating the plaintiff believed she had earned, did not result in any negative consequences and therefore did not constitute a materially adverse action); *Byra–Grzegorczyk v. Bristol–Myers Squibb Co.*, 572 F. Supp. 2d 233, 252 (D. Conn. 2008) (even after *White*, "poor performance reviews" are not materially adverse "in and of themselves"; they "can be considered a part of an adverse action if [they] lead[] to a plaintiff's demotion or termination"); *Dixon v. City of New*

*York*, No. 03–CV–343(DLI)(WP), 2008 WL 4453201, * 16 n.13 (E.D.N.Y. Sept. 30, 2008) ("[C]ourts have uniformly found, pre[– ]and post–*White* that negative evaluations by themselves, do not constitute adverse employment actions for Title VII retaliation purposes."). Because Plaintiff points to no evidence that she suffered negative consequences from what appear to be strong evaluations, even if those evaluations were worse than she deserved, she has failed to demonstrate that Defendant's actions aside from her termination were adverse for purposes of her retaliation claim.

As to Plaintiff's retaliatory termination claim, the Court will assume that Plaintiff has established a *prima facie* case because her evidence on the fourth prong is the same evidence offered to rebut Defendant's proffered legitimate reason for her termination. *See Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002) (the *prima facie* and pretext analyses can "tend to collapse as a practical mater").

Defendant maintains that Plaintiff was discharged immediately after an investigation revealed that without authorization, she had accessed, copied, removed from the Hospital, and disclosed to an unauthorized third–party (her attorney) pink sheets with patients' PHI, in violation of YNHH policies that specifically provide for discipline including termination. Plaintiff's counsel conceded at oral argument that Plaintiff's conduct violated Hospital policies. Plaintiff nonetheless argues that termination for violation of policies was merely pretext, given that she and her colleagues had and were allowed access to pink sheets, which she had previously taken to Yoia without reprecussions; that she had personally redacted the pink sheets; and that Plaintiff only removed pink sheets from the hospital in response to Defendant's request, communicated to her through her counsel, that she produce "[a]ll documents pertaining to your claim that numbers attributed to white, non Jamaican clinical

documentation consultants were embellished," and she then gave the pink sheets to her lawyer.[6]

YNHH personnel conducted a review of Plaintiff's conduct and determined that Plaintiff violated YNHH policies, including the Administrative Policies and Procedures and the Confidentiality Policy, both of which provide for the potential for termination. YNHH personnel determined that Plaintiff never received authorization to remove the pink sheets from the hospital, and there is no evidence that Plaintiff ever sought such authorization, even though the Administrative Policies and Procedures sets forth procedures on how to do so. Plaintiff was trained on those policies, which emphasize the significant distinction between using and copying pink sheets with PHI at work—not a violation of YNHH policies—and copying and taking such information out of the hospital and providing it to unauthorized non–hospital personnel. Thus, the fact that Plaintiff had previously copied pink sheets and showed them to Yoia to bring inaccuracies to her attention, which was not a breach of hospital policies, has no bearing on the significance of Plaintiff's later copying and removal of pink sheets from the hospital premises. Nor does the fact that Defense counsel requested documents in support of Plaintiff's claims; that request did not constitute authorization to disclose PHI, and although channels existed through which Plaintiff could have sought such authorization, including conferring with the hospital Privacy Officer and Risk Management Department and seeking a protective order, she never did. Given the existence of several

_____

[6] Plaintiff also asserts that Defendant has provided inconsistent rationales for terminating her employment: "the defendant first asserted that the use of the pink sheets violated HIPAA. When that was rejected by the court, the defendant then claimed that the use of the pink sheets by the plaintiff was somehow against defendant's policy." (Opp'n at 32.) The letters by Lisitano, Fitzsimmons, and D'Aquilo state that Plaintiff violated patient privacy, in violation of hospital policy and potentially HIPAA.

clear policies that Plaintiff violated, on which she had received training, when she could have sought authorization to disclose redacted pink sheets with a protective order, a reasonable fact finder could not conclude that Defendant's basis for termination was pretextual, and Defendant's motion for summary judgment as to Plaintiff's retaliation claims is granted.[7]

---

[7] Defendant also maintains that the timing of the termination decision—immediately after YNHH completed its investigation concluding that Plaintiff violated hospital policies, but two years after Plaintiff filed her CHRO complaint in April 2007 and nine months after Plaintiff initiated this lawsuit in October 2008—dispels any inference of a causal link between Plaintiff's protected activity and her termination. Defendant notes that although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman–Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), it held in *McIntyre v. Longwood Cent. Sch. Dist.* that "the passage of over a year between the filing of" a complaint with the Equal Employment Opportunity Commission ("EEOC") and allegedly retaliatory action—during which there were no other acts of incidents indicating hostility toward the plaintiff by any other employee—failed to show causation. 380 F. App'x 44, 48 (2d Cir. 2010). Unlike *McIntyre*, in which no employee demonstrated hostility toward the plaintiff after the protected activity and before the adverse action, Plaintiff avers that Yoia continually failed to credit all of her work, after the CHRO complaint was filed and prior to her termination, even though record offers no evidence suggesting any hostility towards Plaintiff by Lisitano, Fitzsimmons, and D'Aquila, the YNHH employees who made the termination decision and reviewed that decision.

D.     Intentional Infliction of Emotional Distress

Plaintiff's counsel conceded at oral argument that the only evidence of distress is Plaintiff's deposition testimony that "I had some nights where I would wake up and I just couldn't go to sleep.  In a matter of three months my hair just went gray."  (Palmer–Williams Dep. at 415:11–14.)  Connecticut courts have held that emotional distress is severe when it reaches a level that "no reasonable person could be expected to endure."  *Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, 175–76 (D. Conn. 2003) (quoting *Mellaly v. Eastman Kodak*, 42 Conn. Supp. 17 (1991) (quoting 1 Restatement (Second), Torts § 46, comment (j))). Plaintiff's reported symptoms and their frequency cannot be found so serious that a reasonable person could not be expected to endure them, and therefore, summary judgment is granted for Defendant on Plaintiff's intentional infliction of emotional distress claim.

III.    Conclusion

Accordingly, Defendant's [Doc. # 67] Motion for Summary Judgment is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

                                    /s/
                          Janet Bond Arterton, U.S.D.J.

            Dated at New Haven, Connecticut this 25th day of March, 2011.